**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO.  5:14-CV-139-DCK**

| | |
|---|---|
| **PLS INVESTMENTS, LLC,**        )<br>       )<br>      **Plaintiff,**      )<br>       )<br>    **v.**        )      <u>**ORDER**</u><br>       )<br>**OCWEN LOAN SERVICING, LLC;  HSBC**  )<br>**BANK USA, NATIONAL ASSOCIATION;**  )<br>**and REAL HOME SERVICES AND**  )<br>**SOLUTIONS, INC.,**      )<br>       )<br>      **Defendants.**      )<br>       ) | |

       **THIS MATTER IS BEFORE THE COURT** on "Defendant's Motion For Summary Judgment" (Document No. 50) and "Defendant's Objection And Motion To Strike Evidence Submitted In Opposition To Summary Judgment" (Document No. 59).  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are ripe for disposition.  Having carefully considered the record, the motions, applicable authority, and the arguments of counsel at a hearing on January 24, 2017, the undersigned will <u>grant</u> the motion for summary judgment, and <u>deny</u> the motion to strike.

## I.     PROCEDURAL BACKGROUND

       Plaintiff initiated this action with the filing of a "Complaint" (Document No. 1-1) in the Superior Court of Ashe County, North Carolina, Case No. 14-CVS-282, on July 16, 2014.[1]  The

---

[1] Plaintiff and its two members, Phil Stevens and Larry Stone, originally filed substantially the same lawsuit against the same Defendants in the Superior Court of Ashe County, North Carolina on December 23, 2013, Case No. 13-CVS-456.  That action was removed to this Court on February 6, 2014, then voluntarily dismissed on March 20, 2014.  See <u>PLS Investments, LLC, Stevens, and Stone v. Ocwen Servicing, LLC et al.</u>, 5:14-CV-021-RLV-DCK, (Document Nos. 1 and 12) (W.D.N.C. 2014).

Complaint asserts claims for: (1) negligence; (2) gross negligence; and (3) unfair and deceptive trade practices. (Document No. 1-1, pp.8-10). The crux of Plaintiff's Complaint is that Defendants caused false information and/or advertisements to be posted on the Internet that described Plaintiff's property as a "foreclosure sale," and that such false information caused a reduction in the fair market value of Plaintiff's property. (Document No. 1-1, pp.6-7).

On August 29, 2014, Ocwen Loan Servicing, LLC ("Ocwen"), HSBC Bank USA, National Association, as trustee for Fremont Home Trust 2004-B Asset Backed Certificates, Series 2004-B ("HSBC"), and Real Home Services and Solutions, Inc. ("RHSS") (collectively, "Defendants") filed a "…Motion To Dismiss" (Document No. 11) pursuant to Fed.R.Civ.P. 12(b)(6) seeking dismissal of Plaintiff's gross negligence and unfair and deceptive trades practices ("UDTPA") claims. The Honorable Richard L. Voorhees denied the motion to dismiss on April 1, 2015. (Document No. 18). In denying the motion to dismiss, Judge Voorhees noted that there was no doubt that Defendants' original error was inadvertent; nevertheless, he found that Plaintiff's claims were plausible and the lawsuit should proceed to discovery. (Document No. 18, pp.11-12). Judge Voorhees further noted that the claims Defendants sought to dismiss might be more appropriately disposed of at summary judgment. Id.

The "Affirmative Defenses And Answer Of The Defendants" (Document 26) was filed on May 8, 2015, and the parties' "Certification And Report of F.R.C.P. 26(f) Conference And Discovery Plan" (Document No. 27), as well as their "Joint Stipulation Of Consent To Exercise Of Jurisdiction By A United States Magistrate Judge" (Document No. 28), were filed on May 28, 2015. This case was reassigned to the undersigned United States Magistrate Judge on May 29, 2015.

On June 8, 2015, the Court issued a "Pretrial Order And Case Management Plan" (Document No. 29) establishing case deadlines that were consistent with the parties' proposed deadlines. <u>See</u> (Document No. 27). The deadlines included the following: discovery completion – December 15, 2015; mediation report – January 15, 2016; dispositive motions – February 15, 2016; and trial – June 6, 2016. (Document No. 29).

On December 15, 2015, the date discovery was due to be completed, the parties filed a "Consent Motion To Extend Discovery Period" (Document No. 30) stating that the "parties are cooperating in completing discovery," but need a sixty-day extension to complete discovery. On December 16, 2015, the undersigned granted the motion. (Document 31).

On January 15, 2016, the parties filed a "Joint Motion To Extend Mediation Deadline" (Document No. 32). On January 19, 2016, the Court granted the extension, and adjusted other case deadlines. (Document No. 33).

On March 9, 2016, the parties filed their "Joint Motion To Extend Scheduling Order Deadlines" (Document No. 38) requesting that the mediation and motions deadlines be extended, without any mention of further extending discovery. The Court granted the motion on March 15, 2016, and then further extended the mediation deadline at the request of the mediator on April 29, 2016. (Document Nos. 39 and 40).

The parties again filed a "Joint Motion To Amend Scheduling Order" (Document No. 42) on May 9, 2016. The undersigned again granted the parties' request. (Document No. 43). Moreover, to accommodate the parties' latest request, the Court also had to move the trial date to February 20, 2017. <u>Id.</u>

On May 23, 2016, the parties filed yet another "Joint Motion To Extend Scheduling Order Deadlines" (Document No. 44). This time, the parties reported that "the primary witness for Real

Home Services and Solutions, Linda McCauley, has recently retired," and therefore, the parties need additional time to identify and depose another witness. (Document No. 44). Again, the Court allowed the parties' joint motion to extend deadlines. (Document No. 45). In granting the motion, the Court stated:

> The parties shall have up to and including **September 26, 2016** to complete all depositions, obtain transcripts of said depositions, and prepare and file dispositive motions and supporting memoranda. Further extension of these deadlines is unlikely.

(Document No. 44, p.1).

"Defendant's Motion For Summary Judgment" (Document No. 50) was timely filed on September 26, 2016. After being allowed an extension of time, "Plaintiff's Response To Defendant's Summary Judgment" (Document No. 56) was filed on October 28, 2016. Defendants failed to file a timely reply brief, or notice of intent not to reply, and the Court then ordered Defendants to file a reply brief. (Document No. 57) (citing Local Rule 7.1 (E)). Defendants filed a reply brief (Document No. 58), and the pending "…Objection And Motion To Strike Evidence Submitted In Opposition To Summary Judgment" (Document No. 59), on November 18, 2016.

On December 16, 2016, one (1) month after the summary judgment motion ripened, and almost three (3) months after all depositions were due to be complete, and transcripts obtained, Plaintiff filed motions for leave to take depositions of Linda McCauley, and of Altisource, Inc. (Document Nos. 63 and 64). Then, on January 6, 2017, more than three (3) years after the initial lawsuit was filed regarding the underlying dispute, and less than six (6) weeks from trial, Plaintiff filed its "Motion For Leave to Amend Complaint And to Add New Defendant Altisource Solutions, Inc." (Document No. 68). On January 12, 2017, the undersigned denied Plaintiff's motions to conduct additional depositions and to amend the Complaint. (Document No. 71).

"Defendant's Motion For Summary Judgment" (Document No. 50) and "Defendant's Objection And Motion To Strike Evidence Submitted In Opposition To Summary Judgment" (Document No. 59) are now ripe for disposition, and immediate review is appropriate.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F.Supp.2d 409 (W.D.N.C. 2011). The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. Id.

### III.    DISCUSSION

**A.  Factual Background**

James Kevin Jordan and wife Sherry D. Jordan (the "Jordans") purchased three adjacent lots in the Jefferson Township of Ashe County, North Carolina in or about April 2000 – April 2001.  (Document No. 1-1, p.5) (Document No. 12, p.2).  The first lot was acquired on or about April 14, 2000, and is located at 374 Bower Lane, Jefferson, NC 28640.  (Document No. 12, p.2) (Document No. 12-1).  This lot consists of approximately three acres, and is identified by Ashe County parcel number 09302-237-004 ("004" or the "PLS Property").  Id.;  see also (Document No. 1-1, p.5).

On or about April 24, 2001, the Jordans acquired title to two vacant lots adjacent to the PLS Property.  (Document No. 12, p.2; Document No. 12-2).  These two adjacent and vacant lots (together the "Jordan Lots") bear Ashe County parcel numbers 09302-237-006A ("006A") and 09302-237-006B ("006B"), with a property address of 374 Bower Lane, Jefferson, NC 28640.  (Document No. 12, p.2);  see also (Document No. 1-1, p.5).  One of these lots is approximately one acre, and the other lot is approximately two acres.  (Document No. 1-1, p.5).

A few years later, on February 11, 2004, the Jordans executed a Deed of Trust that was recorded in the Ashe County Registry at Book 308, page 749, regarding the two adjacent lots.  Id.;  (Document No. 56-3).  Apparently, the Deed of Trust secured a loan of $500,000.00 to the Jordans.  (Document No. 56-3, p.3).   The lender under the Deed of Trust was originally Freemont Investment and Loan, but the Deed of Trust was later assigned to Defendant HSBC in or about May 2004.  (Document No. 56-3);  (Document No. 1-1, pp.5-6);  (Document No. 56, p.1).

On March 10, 2008, Plaintiff PLS purchased the Jordans' first lot, 004, now referred to as the PLS Property.  (Document No. 1-1, p.5);  (Document No. 56, p.1).  This lot includes a home

and about three acres at 374 Bower Lane, and was purchased by Plaintiffs from the Jordans for $1,180,000, "for investment purposes."  Id.  The Jordans retained ownership of their two adjacent lots, 006A and 006B.  "Defendant's Memorandum Of Law …" (Document No. 51) provides the following illustration of the subject properties:



(Document No. 51, p.3).

PLS member, Phil Stevens ("Stevens"), has since testified that prior to PLS' purchase the PLS Property had been appraised at $1.8 million, so they thought they had a good price, and that it was "something we could flip probably you know, in six months to a year."  (Document No. 51-3, p.7); see also (Document No. 51, pp. 13-14, 18).  After selling the property, the Jordans were allowed by PLS to live in the house on the PLS Property from March 2008 until March 2009. (Document No. 51, p.5).

The house was advertised and shown during PLS' first year of ownership, but there were no offers made on the property. (Document No. 51-3, pp.13-14). Andrea Witherspoon ("Witherspoon") was apparently PLS' first listing agent, and the sale price of the PLS Property was originally $1,595,000, and then was later reduced to $1,385,000. (Document No. 51, p.5); (Document No. 51-7, pp.3-4). Only one person viewed the property during Witherspoon's time as the Plaintiff's real estate agent. Id.

During 2009, the Jordans defaulted on their loan payments to Defendant HSBC, and HSBC initiated a foreclosure action. (Document No. 56, p.1). Defendant Ocwen was hired by HSBC to service the loan sometime after the foreclosure action was filed. Id. "At the outset of the foreclosure action, HSBC and Ocwen mistakenly believed that the Jordan's deed of trust encumbered the PLS Property as well as the unimproved lots." (Document No. 56, p.2).

The PLS Property was leased to a third party from May 2009 through September 2010. (Document No. 51, p.5). The lease gave the tenant an option to purchase the PLS Property for $1,200,000 at the conclusion of the lease term, but that option was ultimately declined. (Document No. 51, p.6). Stevens testified that if they had gotten the purchase price in the lease with option, $1.2 million, he would have considered that "breaking even." (Document No. 51-3, pp.17-18).

In September 2010, Stevens moved into the house on the PLS Property. Id. PLS also resumed marketing the PLS Property, this time with agent Irene Sabol ("Sabol"), at a list price of $1,299,500. Id. Plaintiff's agent Sabol later testified that the PLS Property should have been listed at around $800,000. Id.; see also (Document No. 51-8, p.9). Sabol further testified that no one ever contacted her about the property, and there were no showings whatsoever during her tenure as listing agent, which ended in June 2011. (Document No. 51, p.6); (Document No. 51-8, p.10). Sabol suggested reducing the listing price, but she was told no by Plaintiff. Id.

In August 2011, Plaintiff commissioned an appraisal of the PLS Property from Amy Spell ("Spell"), a local real estate agent and licensed appraiser, who estimated the value of the PLS Property to be $925,000. (Document No. 51, p.6); (Document No. 51-9, pp.4-5, 16); (Document No. 51-3, pp.30-32). Spell noted in the appraisal that "supply exceeds demand in most housing designs," and "[t]he market area of the subject property specifically has seen demand decline with regard to single family dwellings." (Document No. 51-3, pp.33-34); (Document No. 51-9, pp.5-6). PLS hired Spell to market the PLS Property for sale from November 2011 through November 2012. (Document No. 51, p.7): (Document No. 51-3, p.35). Plaintiff instructed Spell to list the sales price as $1,350,000, in spite of her appraised value of $925,000. Id. Spell testified that there may have been one or two showings during her tenure as agent, but she did not remember any significant interest in the PLS Property. (Document No. 51, p.7); (Document No. 51-9, pp.7-8).

In October 2012, HSBC obtained title to the Jordan Lots 006A and 006B at a foreclosure sale for $705,526.96. (Document No. 1-1, p.6); (Document No. 56, p.2). On November 26, 2012, Ocwen retained RHSS to market parcel 006B for sale. (Document No. 51, p.7). Plaintiff alleges that around late November or early December 2012, Defendants HSBC and Ocwen caused a "Notice of Eviction" to be posted on the PLS Property, and that at about this same time, HSBC listed the PLS Property as a foreclosure sale with Defendant RHSS.[2] (Document No. 1-1, p.6). Moreover, Plaintiff alleges that RHSS advertised the property as a foreclosure sale "on numerous foreclosure websites including, but not limited to, Foreclosure.com, Hubzu and Realtytrac." Id.

Plaintiff asserts that Ocwen listed the lots with RHSS agent, Linda McCauley ("McCauley"). (Document No. 1-1, p.6); (Document No. 56, p.2). Plaintiff also now contends

---

[2] The Ashe County sheriff did not remove anyone from the property or change the locks. (Document No. 51-3, p.12).

that Defendant Ocwen hired Altisource, the parent company of RHSS, to act as its agent. (Document No. 56, p.2).

The crux of Plaintiff's Complaint is that RHSS' advertisements concerning the PLS Property were false, and that Defendants caused this false information to be disseminated and published throughout the world through the Internet. (Document No. 1-1, p.6). According to the Complaint, all Defendants were put on notice of the "unlawful eviction and false advertising of the Plaintiff's property and . . . Defendants removed the advertisements for the Plaintiff's property from the internet." (Document No. 1-1, p.7).

Defendants acknowledge that McCauley executed a listing agreement for parcel 006B, but deny that McCauley or RHSS took any additional steps to advertise 006B in 2012, or provided any information or photographs regarding parcel 006B or 374 Bower Lane to any third-party website. (Document No. 51, p.8). Defendants further note that Spell contacted McCauley on Friday December 7, 2012, to notify her that a listing on Foreclosure.com showed the house address of 374 Bower Lane. Id. Defendants contend that neither McCauley nor RHSS provided any information regarding 374 Bower Lane to Foreclosure.com. (Document No. 51, p.9). However, McCauley contacted Altisource, who inputted information about parcel 006B onto Hubzu.com, to request the listing be removed from Hubzu.com. Id. By 12:03 p.m., on Monday, December 10, 2012, the listing for parcel 006B had been removed from Hubzu.com. Id.

The Complaint further alleges that in or around October 2013, the PLS Property was again falsely advertised by Defendants on numerous foreclosure websites, and that these postings, as well as earlier postings, included pictures of the interior and exterior of the home on the PLS Property. (Document No. 1-1, p.7). Plaintiff alleges that the PLS Property "has a fair market value in excess of $1.2 million." Id. Plaintiff concludes that Defendants' false advertisement(s) of the

10

PLS Property in 2013 and thereafter "were malicious, willful, wanton and in reckless disregard of the rights and interests of the Plaintiff," and that the advertisements have substantially reduced the fair market value of the PLS Property. Id.

Defendants acknowledge that a second listing agreement for parcel 006B was executed with McCauley and RHSS on or about October 9, 2013. (Document No. 51, p.9). Aside from the listing agreement – which included the 374 Bower Lane street address, the parcel ID number, and a listing price of $727,205 – Defendants contend no other steps were taken to advertise parcel 006B in 2013. Id. Defendants again deny that McCauley or RHSS provided information or photographs regarding 006B or 374 Bower Lane to any third-party website. (Document No. 51, pp.9-10). Altisource inputted data it received regarding parcel 006B onto Hubzu.com. (Document No. 51, p.10). After notice from Plaintiff's counsel on October 23, 2013, that the PLS Property was advertised on various websites "for approximately $700,000," Defendants had the information regarding 006B removed from Hubzu.com on October 24, 2013. McCauley informed Plaintiff's counsel that she could not remove information she did not put on other websites. Id.

Amy Spell did a second appraisal of the PLS Property for Plaintiffs in October 2014. (Document No. 51, p.11); (Document No. 51-9, p.10); (Document No. 51-3, p.40). At that time, Spell appraised the PLS Property at $890,000, based on market conditions. (Document No. 51-9, p.12, 36). Spell testified that her appraisal was not impacted by the fact that Linda McCauley "had previously listed Bower Lane as a foreclosure." (Document No. 51-9, p.12).

In January 2015, PLS again hired Spell to market the PLS Property. (Document No. 51, p.11). Despite her recent appraisal at a much lower value, Spell was instructed to list the PLS Property at $1,295,000. (Document No. 51-9, p.14) (Document No. 51-3, p.45). Finally, Spell testified there were no showings, and no contact from realtors, regarding the PLS Property during

11

the time period she relisted it, up to January 2016. (Document No. 51-9, p.14). Plaintiff did not seek any other appraisals after Spell's 2014 appraisal. (Document No. 51-3, pp.42-43).

In February 2016, PLS reduced the PLS Property list price to $979,000. (Document No. 51, p.11); (Document No. 51-3, pp.24-25). PLS admitted it reduced the price in part based on the most recent Spell appraisal. Id. PLS further testified on May 20, 2016, that it has never had a written offer to buy the PLS Property, and has only shown the property to a total of about five interested parties. (Document No. 51-3, p.26-28).

As of the Court's hearing on January 24, 2017, the PLS Property still has not been sold, and there was no indication of any new interested parties or any offers. Apparently, Phil Stevens still lives in the home on the PLS Property and has done so continuously since September 2010.

## B. Motion for Summary Judgment

The Complaint asserts claims for negligence, gross negligence, and unfair and deceptive trade practices. (Document No. 1-1, pp.8-9). Defendants contend by the pending motion that "PLS has failed to present evidence sufficient to establish several elements of each of its three claims. Regarding its negligence claim, PLS has not identified any evidence supporting a negligent act, damages, or causation attributable to any of the Defendants." (Document No. 51, p.13). Defendants further note that Plaintiff's "claim that it has been damaged is based entirely on speculation." (Document No. 51, p.14). As discussed during the undersigned's hearing on January 24, 2017, based on the undisputed facts of record, the Court's focus is on whether there are any genuine issues of material fact in dispute that preclude summary judgment on Plaintiff's negligence claim.

Defendants first assert that according to North Carolina law, "a plaintiff must present evidence of four essential elements in order to prevail on a negligence claim at summary judgment:

(1) duty, (2) breach of duty, (3) proximate cause, and (4) damages." (Document No. 51, p.14) (citing Estate of Mullis v. Monroe Oil Co., 349 N.C. 196, 201 (1998); see also Synovus Bank v. Coleman, 1:11-CV-066-MR, 887 F.Supp.2d 659, 672 (W.D.N.C. 2012) ("plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach."). Defendants note that to establish gross negligence a party would also need to forecast evidence of "intentional wrongdoing or deliberate misconduct affecting the safety of others." Id. (quoting Lee v. CertainTeed Corp., 205 WL 4526165, at *9 (E.D.N.C. July 27, 2015) (quoting Yancey v. Lea, 354 N.C. 48, 53 (2001).

Defendants argue that Plaintiff's entire lawsuit is based on conjecture, not evidence. (Document No. 51, pp.14-15). They contend that the only thing Plaintiff can prove is that Ocwen hired a listing agent to market parcel 006B, which its client, HSBC, rightfully owns. Id. Even if Plaintiff could identify evidence of a breach by Defendants, Defendants argue that there is not any evidence of damages as a result of the alleged breach. (Document No. 51, p.15). Defendants go on to argue that even if Plaintiff could present evidence of a breach and damages, there is no evidence that Defendants alleged breach caused Plaintiff damages. Id. Finally, Defendants contend that even if Plaintiff identified sufficient evidence to establish each element of a negligence claim, Plaintiff's claim is barred by its own contributory negligence because it did not take any steps to correct any misinformation on the third-party websites. Id.

### 1. Negligent Act

Defendants contend that the entire lawsuit is based on the misguided premise that in 2012 and 2013, Defendants advertised the PLS Property for sale, instead of HSBC's parcels 006A and/or 006B. (Document No. 51, p.16) (citing Document No. 1-1, ¶¶ 20-21). Defendants argue that they never took any steps to advertise the PLS Property; rather, they only hired McCauley to list parcel

006B, and provided data regarding 006B to Altisource. Id. They further argue that they did not provide any information to, and do not have control over, sites like Foreclosure.com and Realtytrac.com. Id. (citing Document No. 51-5, p.29).

Defendants note that Plaintiff has never produced a copy of the purportedly wrongful advertisement on Hubzu.com . (Document No. 58, p.8). Moreover, Defendants assert that Plaintiff failed to timely seek any discovery regarding Hubzu.com or Altisource's involvement, and that this failure "is now fatal to PLS' position." (Document No. 58, p.11) (citing Nelson v. Montgomery, 3:12-CV-699-DCK, 2014 WL 1571208, at * 12 (W.D.N.C. Apr. 17, 2014).

Defendants suggest that Foreclosure.com, Realtytrac.com, and other third-party websites culled the information advertising parcel 006B, and repackaged it with photographs of the interior and exterior of the home on the PLS Property, which had been widely available on the Internet for years. (Document No. 51, p.16; Document No. 58, pp.8-9). Defendants argue that such actions are outside their control and cannot be attributed to any negligent act by them. Id. Defendants also correctly note that the PLS Property, as well as the adjacent parcels, 006A and 006B, have all been identified with the address 374 Bower Lane. (Document No. 58, p.10).

In opposition to the motion for summary judgment, Plaintiff first asserts that "Defendants claim that a third-party, Altisource, was responsible for the wrongful advertising of the PLS property and this action should be therefore dismissed." (Document No. 56, p.6) (citing Document No. 51, p.16). Plaintiff's initial argument is completely inconsistent with the statement in the cited text. Rather than claiming Altisource was responsible for wrongful advertising, Defendants simply acknowledged that they "provid[ed] data regarding Parcel 6B to Altisource." (Document No. 51, p.16). As such, Plaintiff's opening volley appears reflective of the entirety of its case: it takes a little bit of information and leaps to inflated conclusions without sufficient support in the record.

Plaintiff goes on to conclude that "Altisource and RHSS wrongfully marketed the PLS property as a foreclosure on Hubzu in 2012 and 2013, and that their negligence is imputed to Ocwen and HSBC." (Document No. 56, p.9). However, Plaintiff does not cite any evidence that Defendants, or their alleged agents, "marketed the PLS property as a foreclosure." Plaintiff then seems to contradict itself when it asserts that there is a factual issue as to which entity initiated the Hubzu.com advertisements in 2013 that led to Plaintiff's claims. (Document No. 56, p.10). The opposition brief asserts that Altisource and RHSS wrongfully marketed the PLS property on Hubzu.com. (Document No. 56, p.9). As noted by Defendants, "PLS has never identified the false information or the specific facts tying that information to any of the Defendants." (Document No. 58, p.1).

The undersigned is persuaded that the evidence of record does not create a triable issue of fact as to the allegation that Defendants falsely advertised the PLS Property. Rather, the record reflects that Defendants, and/or related entities or agents, listed HSBC's parcel 006B. Then, somehow, the information pertinent to parcel 006B and the PLS Property were apparently conflated on some websites. There is still no evidence that Defendants' alleged contributions to the confusion were any more than inadvertent; and there is no evidence that Defendants advertised, or even attempted to advertise the PLS Property, or that they would have any reason to advertise the PLS Property as a foreclosure.

The issue of Defendants' conduct does present the closest call of the issues currently before the Court. Nevertheless, in over three (3) years of litigating this matter, Plaintiff has failed to discover evidence that presents a genuine issue of material fact as to whether Defendants acted negligently.

### 2. Damages

The Complaint alleges that Defendants' wrongful advertisement of Plaintiff's property has decreased the value of the PLS Property and that it has received offers to purchase the property which are significantly lower than its fair market value. (Document No. 1-1, ¶¶ 32-33). Defendant correctly notes in its memorandum that contrary to the Complaint's allegation, Plaintiff has since admitted that it has never had *any* offer to purchase the PLS Property. (Document No. 51, p.17); see also (Document No. 51-3, pp.24-25).

Next, Defendant argues that there is simply no evidence that Defendants' efforts to market parcel 006B had any effect on the PLS Property. (Document No. 51, p.17). Defendants note that under North Carolina law a plaintiff seeking actual, pecuniary damages bears the burden of providing "evidence of their existence and extent, and some data from which they may be computed." (Document No. 51, p.18) (quoting Phillips v. Universal Underwriters Ins. Co., 257 S.E.2d 671, 673 (N.C.App. 1979)). And, "North Carolina law does not allow an award of damages based upon speculation or conjecture." Id. (quoting Morgan's Ferry Prods., LLC v. Rudd, 18 F.Appx. 111, 114 (4th Cir. 2001)).

As noted above, Defendants' own licensed appraiser and real estate agent, Spell, valued the PLS Property at $925,000 in August 2011, and $890,000 in October 2014. (Document No. 51, p.18). Defendants argue that this is the only data provided by Plaintiff regarding the PLS Property, and it does not show a significant decrease in value before and after the 006A and 006B parcels were foreclosed upon and the allegedly false advertisements were posted. Id. Moreover, Spell testified that the values were based on market conditions, not the attempts to sell parcel 006B. Id.

Plaintiff's only support for their alleged diminution in value are the opinions of its members Phil Stevens and Larry Stone, and even they do not completely agree. Stevens testified that he

16

believes the damage to PLS is $500,000; Stone testified that the damages are between $400,000 and $500,000. (Document No. 58, p.3). Neither cites any data or other evidence, instead relying on a "feeling." (Document No. 58, pp.3-4). Defendants assert that such opinions are purely speculative, and are based on the belief that their personal reputations in the community were affected by the advertisements. Id.

In response, as well as at oral argument, Plaintiff merely doubles down on its position that Stevens and Stone are competent to testify to Plaintiff's damages, even though it acknowledges they are interested witnesses and don't agree on an amount of damages. See (Document No. 56, pp.16-17) (citing Dep't of Trans. v. M.M. Fowler, 361 NC 1, 23 (2006).

It is not clear to the undersigned how Plaintiff's citation to the dissent in Fowler is instructive here. That case involves a condemnation action, and the majority opines that "[i]n most instances landowners seek to prove fair market value through the testimony of the owners themselves and that of appraisers offered as expert witnesses." Fowler, 361 NC at 6. In addition, the opinion goes on to state that allowing evidence of lost business profits in valuing land is impermissible. Id. at 9-10. Defendants cite Fowler in their reply, casting further doubt on Plaintiff's reliance on this case. (Document No. 58, p.4) (quoting Fowler, 361 N.C. at 6) ("Admission of evidence that does not help the jury calculate the fair market value of the land or diminution in its value may "confuse the minds of the jury, and should be excluded." https://1.next.westlaw.com/Link/Document/FullText?findType=Y&serNum=1908011778&pubNum=710&originatingDoc=I21c1eee18c5811dba10be1078cee05f1&refType=RP&fi=co_pp_sp_710_185&originationContext=document&transitionType=DocumentItem&contextData=(sc.UserEnteredCitation)-co_pp_sp_710_185 . . . In particular, specific evidence of a landowner's noncompensable losses following condemnation is inadmissible.")

In this case, Plaintiff has dismissed its expert witness, and intends to rely on the opinions of its members. Notably, the Complaint asserts that the fair market value of the PLS Property is in excess of $1.2 million, even though its own appraisals have never valued the PLS Property above $925,000. Plaintiff also contends the value of the PLS Property has been diminished by somewhere between $400,000 and $500,000, even though it has never had an offer on the PLS Property, and currently lists it for sale at or about $979,000. Based on Plaintiff's argument, if the PLS Property has suffered a diminution in value of $400,000 to $500,000, it would have sold for, or been listed at, $700,000-$800,000. Plaintiff acknowledged at the hearing that if the PLS Property were sold tomorrow for $1.2 million, it will have suffered little, if any, damage.

It is entirely unclear, even after oral arguments, how Plaintiff has ever calculated the value of this property, especially since it has never been listed at a price consistent with either appraisal of record. Moreover, Plaintiff offers no evidence in the form of data, comparable property valuation, or expert testimony regarding its valuation, or its alleged damages.

PLS may have mitigated its own alleged losses by allowing the Jordans to stay in the house for about a year, leasing the house to a potential buyer for another year, and having Stevens live in the house since 2010; however, there does not appear to be any accounting for how those uses of the PLS Property have offset Plaintiff's damages. Defendants' exhibits show that Plaintiff rented the house in 2009-2010 for $2,500.00 per month, and that the lessee was responsible for some expenses associated with maintaining the property. See (Document No. 51-3, pp.65-69). If the house has indeed been continuously occupied since PLS purchased it, and the monthly rental value is at least $2,500, PLS may have actually recovered a benefit of around $300,000. None of this is addressed. Not only is it unclear how Plaintiff has calculated its alleged damages, it does not appear that Plaintiff has shown how it has suffered any damages.

In short, the undersigned agrees with Defendants that their best argument for summary judgment is that the alleged damages here are unacceptably speculative. The undersigned finds the following authority cited by the Honorable James C. Dever III, in the Eastern District of North Carolina, to be instructive:

> "The burden of proving damages is on the party seeking them," and that party "must show that the amount of damages is **based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty**." *Olivetti Corp. v. Ames Bus. Sys., Inc.,* 319 N.C. 534, 547–48, 356 S.E.2d 578, 586 (1987); *Silicon Knights, Inc. v. Epic Games, Inc.,* No. 5:07–CV–275–D, 2011 WL 6748518, at *10 (E.D.N.C. Dec.22, 2011) (unpublished) (collecting cases). This standard "does not require absolute certainty, [but] it **requires something more than hypothetical or speculative forecasts**." *Med. Staffing Network, Inc. v. Ridgway,* 194 N.C.App. 649, 660, 670 S.E.2d 321, 330 (2009) (quotation omitted); *see Perfecting Serv. Co. v. Prod. Dev. & Sales Co.,* 259 N.C. 400, 417, 131 S.E.2d 9, 22 (1963) ("Absolute certainty is not required but evidence of damages must be sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion." (quotation omitted)). "Any reference to ... potential offers [for real property] is speculative, and thus cannot establish damages." *In re Devotion Assocs., Ltd.,* 86 F.3d 1149, 1996 WL 265990, at *2 (4th Cir. May 20, 1996) (per curiam) (unpublished table decision). "Whether a party's evidence meets the 'reasonable certainty' standard is a question of law for the court." *Ross v. Wash. Mut. Bank,* 566 F.Supp.2d 468, 482 (E.D.N.C. 2008), *aff'd,* 625 F.3d 808 (4th Cir. 2010).

Stillwagon v. Innsbrook Golf & Marina, LLC, 2:13-CV-18-D, 2014 WL 5871188, at *5 (E.D.N.C. Nov. 12, 2014) (emphasis added).

Plaintiff has failed to show specific facts to support its claim for damages. The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248.

**3. Causation**

> To establish proximate cause, a plaintiff must identify facts showing that the defendant, "unbroken by any new and independent cause, produced [his] injuries." *Town of Nags Head v. Toloczko*, 2:11-CV-0001-D, 2014 WL 4219516, at *17 (E.D.N.C. Aug. 18, 2014) (quoting *Adams v. Mills*, 322 S.E.2d 164, 172 (N.C. 1984)). Where speculation or conjecture would be required to determine whether a plaintiff's damage resulted from a defendant's action or inaction, summary judgment in favor of the defendant is warranted. *Elm St. Gallery, Inc. v. Williams*, 663 S.E.2d 874, 879 (N.C. Ct. App. 2008) (affirming summary judgment in favor of defendants where plaintiffs failed to provide evidence sufficient to establish that defendants, as opposed to one of many other possible sources, caused a fire in plaintiffs' building).

(Documents No. 51, p.19); see also, Document N. 58, p.6) (quoting Taylor v. Interim Healthcare of Raleigh-Durham, Inc., 154 N.C.App. 349, 354 (2002)).

Defendants contend that even if Plaintiff established the other elements of its claims, it still has not met its burden to forecast evidence establishing proximate cause. Id. They assert that there is no evidence connecting the alleged decrease in value of the PLS Property to any of Defendants' actions; but, there are many reasons the value may have diminished that have nothing to do with Defendants. Id. Notably, Plaintiff has not been able to sell the PLS Property for eight years, **four of which** occurred *before* the foreclosure of parcels 006A and 006B. Id.

Defendants also note that none of the realtors Plaintiff hired, nor any appraiser, has testified that the advertisements in question had any effect on the fair market value of the PLS Property. (Document No. 58, p.6). Even the PLS members have acknowledged that the Ashe County market suffered a downturn and that the demand for million-dollar houses has decreased. (Document No. 58, pp.6-7). Stevens admitted that "when you're dealing with million dollar plus properties, only 1 percent of the population can afford that." (Document No. 58, p.7) (quoting Document No. 51-3, p.18).

Defendants further note that both Spell and Stevens agreed that in or about 2011, the Ashe County real estate market had decreased in value approximately 15-30% from the previous year. (Document No. 58, p.7) (citing Document No. 51-3, p.34). If the PLS Property was valued at $1,200,000 in 2010, that agreement about the market's valuation suggests that Stevens recognizes that the value of the PLS Property in 2011 likely dropped to between about $840,000 and 1,020,000. Spell's initial appraisal of $925,000 in 2011 appears to account for that decline in the market; nevertheless, Plaintiff then listed the PLS Property at a sale price of $1,350,000. (Document No. 51-3, p.35); see also (Document No. 51-9, p.9).

Like damages, Plaintiff seems to assert that causation is an issue for the jury, but offers little, if any, explanation as to how Defendants' alleged negligence is the proximate cause of Plaintiff's alleged damages. (Document No. 56, p.16). Here again, the undersigned finds Defendants' arguments and authority persuasive. Even *if* Defendants are responsible for some misinformation regarding the PLS Property ending up on the Internet, Plaintiff has failed to forecast evidence that such action(s), "unbroken by any new and independent cause," produced Plaintiff's alleged injuries.

For example, the fact that the PLS Property was on the market, without any offers, for four years before the alleged false advertising strongly supports Defendants' position. In addition, Plaintiff seems to ignore a major national recession occurring at the same time, and its own acknowledgement that only about 1 percent of the population is ever in the market for a million-dollar property. Finally, it is impossible to ignore the possibility that Plaintiff may be contributorily negligent for ignoring its own professionals' advice and appraisals, and the market conditions, and for failing to make greater efforts to remove allegedly false information from the Internet.

Based on the foregoing, the undersigned is persuaded that summary judgment for Defendants is appropriate in this case. Plaintiff has simply failed to forecast sufficient evidence that would allow a reasonable jury to return a verdict against these Defendants. Even *if* Defendants' or their alleged agents' conduct in advertising parcel 006B was somehow careless or inaccurate, Plaintiff has failed to show that Defendants are the proximate cause of its injuries or to forecast more than mere speculation regarding damages.

The Court has focused on Plaintiff's negligence claim; since that claim falls short, the undersigned is convinced there is even less support for Plaintiff's gross negligence and UDTPA claims. The arguments and record simply do not provide sufficient factual support for "wanton conduct done with conscious or reckless disregard for the rights and safety of others" to support a gross negligence claim; or, "some type of egregious or aggravating circumstances" to support a UDTPA claim. See F.D.I.C. ex rel. Co-op. Bank v. Rippy, 799 F.3d 301, 314 (4th Cir. 2015) and McManus v. GMRI, Inc., 3:12-CV-009-DCK, 2012 WL 2577420, at *6 (W.D.N.C. July 3, 2012).

## C. Motion to Strike Evidence

The undersigned finds that the motion to strike should be denied as moot. The undersigned is persuaded that summary judgment for Defendants is appropriate, regardless of the disputed "evidence" (Document Nos. 56-17 – 56-20) presented by Plaintiff.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that "Defendant's Motion For Summary Judgment" (Document No. 50) is **GRANTED**.

**IT IS FURTHER ORDERED** that "Defendant's Objection And Motion To Strike Evidence Submitted In Opposition To Summary Judgment" is **DENIED AS MOOT**.

**SO ORDERED**.

Signed: January 31, 2017

David C. Keesler
United States Magistrate Judge